J-A18027-17

2017 PA Super 287

IN RE: ESTATE OF JOHN BRUMBAUGH | IN THE SUPERIOR COURT OF
PENNSYLVANIA

APPEAL OF: JUDY MCCLINTOCK

No. 154 WDA 2017

Appeal from the Order of December 21, 2016
In the Court of Common Pleas of Bedford County
Orphans' Court at No(s): 26 for 2016

BEFORE:  BOWES, J., LAZARUS, J., and OTT, J.

OPINION BY LAZARUS, J.:                    **FILED SEPTEMBER 6, 2017**

Judy McClintock appeals from the order entered in the Court of Common Pleas of Bedford County, Orphans' Court Division, sustaining Appellee Marjorie Brumbaugh's appeal from the Register of Wills.  Upon careful review, we affirm.

John Brumbaugh ("Decedent") died on November 7, 2015.  At the time of his death, he resided with McClintock, with whom he had been romantically involved for over nine years.  Letters of Administration were issued to Decedent's mother, Marjorie Brumbaugh, on November 12, 2015. On January 15, 2016, McClintock filed a petition before the Register of Wills seeking to probate a document dated March 22, 2015 and purporting to be a photocopy of Decedent's last will and testament.  McClintock claimed to have found the document in the Decedent's zippered bank pouch, in which he

kept his important papers. Brumbaugh opposed the petition, but, on May 4, 2016, the Register issued a decision admitting the document to probate as the Decedent's will and revoking Brumbaugh's Letters of Administration. In her decision, the Register stated as follows:

> The document produced by Ms. McClintock and purported to be the decedent's Will was notarized by Dorothy E. Lykins, formerly Dorothy E. Hilton, a notary public in the state of Ohio. She also serves as the Clerk of Courts for the City of Franklin Municipal Court in Franklin, Ohio. Ms. Lykins confirmed the subject Will was signed by the decedent in front of her and the Will sought to be admitted to probate was in fact the one signed by the decedent. She also explained the circumstances involving his execution of the Will and the type of writing instrument he used. No handwriting expert testified before me on [McClintock's] behalf so as to give an opinion contesting the Will or the decedent's signature thereon.
>
> Per the document admitted into evidence, the testimony presented to me at the hearing, including the Affidavit of Ms. Lykins, and my telephone conversation with Ms. Lykins, it appears that such document is the decedent's Last Will and Testament and was intended so to be.

Decision of the Register of Wills, 5/4/16, at [2].

Brumbaugh filed an appeal to the Orphans' Court[1] asserting that the Register improperly admitted the photocopy to probate, absent the requisite proof that the original had not been revoked and/or destroyed. Brumbaugh

---

[1] A hearing on appeal to the Orphans' Court from a decision of the Register of Wills is *de novo*, unless the parties have agreed otherwise. **See** 20 Pa.C.S.A. § 776; **In re Estate of Luongo**, 823 A.2d 942, 960 (Pa. Super. 2003). In a hearing *de novo,* the Orphans' Court does not base its decision on the testimony offered before the Register, but hears all evidence that either party desires to present and makes its own credibility determinations. **Luongo**, **supra**.

argued that the Register improperly relied on an affidavit signed by the notary, despite her repeated objections to the admissibility of the statement. Brumbaugh also asserted that the Register's decision was based, in part, on an improper *ex parte* conversation with the notary. Brumbaugh argued that the document was either forged or altered and that neither the proponent nor the Register permitted her to submit it to a document examiner for analysis prior to the Register rendering its decision.

The Orphans' Court held hearings in the matter on August 25, 2016 and October 7, 2016, at which time it heard the testimony of, *inter alia*, McClintock, Lykins and Khody Detwiler, a document examiner. On December 21, 2016, in open court, the court rendered its decision, concluding that McClintock had failed to sustain her burden of proving that the original will was not revoked by the testator. Specifically, the court found that McClintock failed to prove that the contents of the original will were substantially as appeared on the copy of the will presented for probate. Accordingly, the Orphans' Court reversed the order of the Register and directed that the probate of the document in question be vacated. McClintock filed a timely appeal, in which she raises the following issue for our consideration:

> Did the Orphans' Court below err in reversing the decision of the Register of Wills, which had admitted to probate the document at issue at the Last Will and Testament of John Edward Brumbaugh, on the basis it could not so qualify because of the photostatic nature of its non-notarial content, given the circumstances present?

Brief of Appellant, at 4.

We begin by noting our scope and standard of review on appeal from a decree of the Orphans' Court adjudicating an appeal from probate:

> [T]he hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

*In re Estate of Nalaschi*, 90 A.3d 8, 11 (Pa. Super. 2014), quoting *In re Bosley*, 26 A.3d 1104, 1107 (Pa. Super. 2011) (internal citations omitted).

Here, the document submitted for probate was not an original will, but a photocopy.[2] Where a testator retains the custody and possession of his will and, after his death, the will cannot be found, a presumption arises that it was revoked or destroyed by the testator. *In re Estate of Murray*, 171 A.2d 171, 176 (Pa. 1961). In order to establish the existence of a lost will which was in the custody of the testator prior to his death, the proponent of the will must overcome the presumption that the testator destroyed or revoked the will. *Burns v. Kabboul*, 595 A.2d 1153, 1167 (Pa. Super. 1991), citing *In re Estate of Keiser*, 560 A.2d 148, 151 (Pa. Super. 1989). In order to overcome the presumption and establish the existence of a lost

---

[2] The only portion of the document that was not photostatic in nature was the notarial act.

will, the proponent of the copy must prove that: (1) the testator duly and properly executed the original will; (2) the contents of the will were substantially as appears on the copy of the will presented for probate; and (3) when the testator died, the will remained undestroyed or revoked by him. ***In re Estate of Janosky***, 827 A.2d 512, 519–20 (Pa. Super. 2003). The proponent's evidence must be positive, clear and satisfactory. ***In re Estate of Murray***, 171 A.2d at 176.

Here, the Orphans' Court concluded that McClintock failed to prove the second prong of the test, i.e., that the contents of the photocopied will were substantially the same as the original document. In arriving at this conclusion, the court relied primarily on the testimony of two witnesses: Detwiler, the forensic document examiner, whose testimony the court found credible, and Lykins, the notary, whose testimony the court found not credible. A brief summary of these witnesses' testimony is in order.

Dorothy Lykins is a notary from Franklin, Ohio. Lykins' husband, Jeff, is the owner/operator of a trucking company. Decedent served as Jeff's dispatcher, acquiring loads for him to haul. Although Lykins had never met Decedent prior to the execution of his will, she stated that she had previously notarized documents for him. Lykins testified that, on March 22, 2015, Decedent called her husband's cell phone and asked if Lykins could come to Zanesville, Ohio – approximately three hours away – to notarize his will. Lykins agreed and rode to Ohio with Jeff in his semi-truck. The couple

met Decedent at AK Steel in Zanesville, where Jeff was also picking up a load of steel.

Lykins testified that she, Jeff and Decedent then drove to the parking lot of a nearby truck stop. Lykins stated that, by that time, it was "late evening, early morning" and it was dark. N.T. Trial, 10/7/16, at 21. She testified that the Decedent "held up a document and indicated that that was his Will that he wanted me to [n]otarize for Judy." *Id.* at 22. She asked him for his driver's license and he provided her with a state I.D. Lykins indicated that she was familiar with Decedent's signature because she deposited the checks with which Decedent paid her husband. She stated that she notarized the document and took a photograph of it with her cell phone. Lykins testified that she did not actually see the Decedent write or sign the will, but that she had seen him strike out the misspelled name of Muskingum County and handwrite the correctly spelled name on the document. Lykins testified that she had provided a copy of the photograph she took of the executed will to McClintock's counsel after Decedent's death. However, she had since obtained a new phone and had lost access to the original picture.

On cross-examination, Brumbaugh's counsel raised certain discrepancies between Lykins' in-court testimony and the affidavit she had previously prepared for submission to the Register of Wills. Notably, although Lykins had testified at trial that the only word she actually witnessed the Decedent hand-write on the will was the correction for

Muskingum County, her affidavit stated that Decedent "complet[ed] and sign[ed] the document in his own hand" and that "[i]mmediately prior to signing his name he wrote the name of Judy McClintock." Affidavit of Dorothy E. Lykins, 2/4/16.

Khody Detwiler also testified. Detwiler has been employed as a forensic document examiner since 2008. Based upon toner particles present on the document, Detwiler concluded that, while the notarial act contained on the document was original, "[t]he printed text in the body of the document as well as the signature of John Brumbaugh is a photocopy reproduction[.]" N.T. Trial, 8/25/16, at 59-60. Detwiler also concluded that the name "Judy McClintock" in the center portion of the document – that portion of the document that purports to dispose of "[a]ll other money and properties" belonging to the Decedent, *see* Purported Will, 3/22/15 – was also a photocopy reproduction and not original ink. *See* N.T. Trial, 8/25/16, at 61. Detwiler noted an extraneous mark attached to the name "Judy McClintock," as well as "trash marks"[3] surrounding the name, which can only

_____

[3] A "trash mark" or "artifact" results from repeated reproduction of a document. Detwiler testified as follows:

> [B]asically when you have artifacts on the document, it comes from the copying process when the document is copied over and over and over and over. Again, different machines, whether or not it's scanned, sent in an E-mail, and then printed out, and then copied again.

*(Footnote Continued Next Page)*

be found in that particular portion of the document. Detwiler testified that "if [the] document was all created at the same exact time, you would expect those trash marks to be everywhere else as well." *Id.* at 63. Detwiler concluded that "having this many artifacts around that particular portion, and nowhere else, I can't eliminate the possibility that that didn't come from a separate document, and was incorporated into this document." *Id.* at 65. In other words, Detwiler could not rule out that McClintock's name had been cut and pasted into the document.

Detwiler also noted peculiarities in the document's layout. In particular, Detwiler testified:

> [T]he thing that really really strikes me is the very last, almost full line of printed text, there's a very large void at the end of the line. But then when you look right beneath it, the name Judy McClintock is indented almost an inch, and it's also squeezed right up against the bottom of the last line.
>
> . . .
>
> If you look at – for example the vertical spacing between each line, it's fairly consistent as you go up the page.

*(Footnote Continued)* ————————

> If it's faxed, you're going to pick up marks. You're going to pick up marks from the machine, whether or not there's a mark on the drum, a mark on the glass. That they get put on the document, and then they get copied again over and over and over.
>
> The other thing that can create trash marks is if the document isn't perfectly flat on the glass when you're making a photocopy.

N.T. Trial, 8/25/16, at 64.

But it's not consistent here between the name Judy McClintock and the last full line. Now if you look at the left and right margins. Again, you see that the writer goes essentially the whole way from the left to the right. And every single sentence, except for the last one, they stop short. And then all of a sudden the Judy McClintock name, is indented almost an inch. And then it's just the name squeezed in.

*Id.* at 70, 72.

Detwiler further testified that the correction of the spelling of Muskingum County was also a photocopy reproduction and not originally written on the paper. Detwiler concluded this based on the fact that "there's no bleed through on the back of the document which you would expect to find. There's no impressions or indentations here [under the word "Muskingum"], but you can feel them [w]here there is original writing." N.T. Trial, 10/7/16, at 109. Detwiler also noted toner deposits around the corrected word "Muskingum." Detwiler concluded that he "[a]bsolutely" had questions about the validity of the document. N.T. Trial, 8/25/16, at 73.

McClintock concedes that the will is a copy. However, she speculates that the Decedent, himself, "made a copy, either at the steel company site or at the convenience store, of the original document first shown at the steel site to [Lykins], and that he substituted the photocopy for the original as a less messy and clearer representation of his Will for her to notarize[.]" Brief of Appellant, at 8. McClintock argues that Detwiler, the document examiner, "did **not** testify that any 'doctoring' had in fact occurred in reproducing the document from the original." *Id.* at 11 (emphasis in original).

McClintock asserts that this matter is controlled by our Supreme Court's decision in **Estate of Ervien**, 233 A.2d 887 (Pa. 1967). There, the decedent and her husband executed wills on the same day with virtually identical dispositive provisions. Decedent's husband predeceased her, leaving her his share of his family business, which in turn formed the bulk of decedent's estate upon her own death. Prior to her death, and in the course of moving from her house to an apartment, decedent, who had weak eyesight and was extremely careless about her personal effects, had gone through her personal papers and disposed of a great deal of trash. Following her death, an unsigned copy of her will was located in an envelope also containing an unsigned copy of her husband's will, her apartment lease, and other printed material given to her by her landlord. The envelope was addressed to her brother-in-law, whose daughter and grandson were the beneficiaries of decedent's will. The envelope was found in a desk drawer on which decedent's brother-in-law had placed a lock to help decedent "preserve her things from her carelessness." *Id.* at 889 (Roberts, J., dissenting).

Following the decedent's death, the Register of Wills of Montgomery County refused to probate the unsigned copy of the decedent's will. After a hearing *de novo*, the Orphans' Court reversed and ordered that the

document be admitted to probate. The lower court's reasoning was summarized by Justice Roberts in his dissent[4] as follows:

> From the fact that no less than a year before her death [decedent] placed the unsigned copy of her will in the same envelope with a copy of her husband's will and with her lease, the orphans' court concluded that she deemed it of great value at that time. Then the court proceeded to reason that [decedent] could hardly have considered the copy of her will to be of value if she had destroyed the original [a]nimo revocandi. In addition, the opinion of the court seems to suggest that [decedent's] poor eyesight, carelessness and moving explain the absence of the will from her effects and that the source of her property[, i.e., her husband's family business,] the situation in which she made her will[, i.e., at the same time as her husband and with virtually identical dispositive provisions,] and her relationship to [her brother-in-law] make it unlikely that she would have deliberately acted to prevent her estate from passing to [her brother-in-law's] descendants.

*Id.* The Supreme Court, without explication, affirmed the decision of the Orphans' Court.

McClintock analogizes the instant matter to *Ervien*, as she testified to having found the purported will with Decedent's other valuable papers. McClintock asserts:

> The same question asked in *Ervien* should be asked in this case. If [Decedent] destroyed the original of his Will with the intent of revoking it, why would he have preserved the document at issue for more than 7½ months after its notarization until his death? Like the decedent in *Ervien*, he kept it together with other financial items in one contained enclosure which he carried with

---

[4] The majority's brief opinion discusses neither the evidence adduced in the Orphans' Court nor the applicable law. Rather, the Court simply noted its review of the record and concluded there was no abuse of discretion by the lower court. Accordingly, we rely on the facts recited in the dissent.

him in going from location to location. In this case, unlike in **Ervien**, those other items were **current** by their very nature, i.e. his checkbook with blank checks and registers. Why should the document at issue be assigned any different character as to its nature?

Brief of Appellant, at 21 (emphasis in original).

This argument, however, misses the mark. In particular, it assumes that the Orphans' Court found credible McClintock's claim that she discovered the alleged will with Decedent's other important documents. Indeed, the court found just the opposite:

I understand that Ms. McClintock's testimony that she found the will with the decedent's other important documents is important evidence and I do consider that. **But I do not find it to be especially credible given the other circumstances surrounding the will**[.]

N.T. Findings of Fact and Conclusions of Law, 12/21/16, at 12. Based upon the foregoing, it is apparent that the court did not, in fact, believe that McClintock discovered the photocopied document amongst the Decedent's important papers, and, thus, the holding in **Ervien** garners McClintock no relief.

McClintock also argues that the court erred in relying on document examiner Detwiler's testimony to conclude that the document in question was doctored or fraudulently altered. McClintock asserts that, in fact, Detwiler testified that his examination was "inconclusive" as to whether the document had been altered. This argument mischaracterizes both Detwiler's testimony and the burden of proof applicable to McClintock in this matter.

In order to probate a copy of a lost will, the proponent must overcome the presumption that the testator destroyed or revoked the will by positive, clear and satisfactory evidence. **Estate of Murray**, **supra**. While Detwiler did testify that his examination of the document was inconclusive, it does not follow that the trial court committed error by relying on his testimony to conclude that the burden as to the second prong of that test – that the contents of Decedent's will were substantially as appears on the copy of the will presented for probate – had not been met. Detwiler testified that, because the document he examined was a photocopy, he could not conclusively determine the significance of the various anomalies within the document without examining the original. **See** N.T. Trial, 8/25/16, at 92. In other words, by the very nature of the only available document, a definitive conclusion as to its authenticity was impossible. However, Detwiler did point out numerous anomalies, such as isolated trash marks and toner particles, the presence of white-out, and the inconsistent spacing of Judy McClintock's name, which raised serious questions as to the document's authenticity. On this basis, the Orphans' Court was well within its discretion to conclude that McClintock did not meet her heavy burden of proof.

Finally, we briefly address McClintock's argument regarding the testimony of Dorothy Lykins. As noted above, the Orphans' Court found Lykins to be an incredible witness. McClintock challenges the court's credibility assessment as follows:

> As not only the Notary Public but also the Chief Clerk of the City of Franklin Municipal Court for the State of Ohio, Dorothy Lykins is an authority figure whose word/testimony is to be and should be respected. There is nothing in the record to indicate anything that would or could have biased or impeached her testimony on these **key** facts. Therefore, even if her Affidavit was not completely in line with her testimony, that is of no significance whatsoever.

Brief of Appellant, at 26.

The notion that Lykins' testimony is not to be questioned because of her status as a public official is both dangerous and absurd and, as such, may be dismissed out of hand. The testimony of an elected official in a court of law is entitled to no greater presumption of credibility than that of any other citizen; to suggest otherwise is to begin a journey down a slippery slope.

In sum, the Orphans' Court's decision in this matter was based largely on credibility determinations which, based upon our review, are clearly supported in the record. *Nalaschi*, *supra*. Moreover, we can discern no error of law in the court's conclusion that McClintock failed to establish by positive, clear and satisfactory evidence, *Murray*, *supra*, that the contents of Decedent's will were substantially as appeared on the photocopied document presented for probate. *Janosky*, *supra*. Accordingly, we affirm the order of the Orphans' Court.

Order affirmed.

- 14 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>9/6/2017</u>